**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VILLAGE OF ORLAND PARK, an Illinois home-rule municipal corporation, et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 20-cv-03528 |
| v. | ) ) | Judge Andrea R. Wood |
| JAY ROBERT PRITZKER, Governor of the State of Illinois, in his official capacity, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This lawsuit represents one of several legal challenges to a series of executive orders issued by Illinois Governor Jay Robert Pritzker ("Governor") over the past few months in response to the public-health emergency presented by COVID-19. The plaintiffs in this case consist of the Village of Orland Park ("Village"), a home-rule municipality located in northeastern Illinois; Tom McMullen, the owner of a restaurant and pub in the Village known as the Brass Tap; and Gregory Buban and Joe Solek, two individual residents of the Village (collectively, "Plaintiffs"). Together, Plaintiffs have sued the Governor seeking injunctive and declaratory relief against enforcement of the challenged executive orders on the grounds that the orders violate Plaintiffs' rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, various provisions of the Illinois Constitution, and the Illinois Department of Public Health Act ("IDPHA"), 20 ILCS 2305/1.1 *et seq.* Before the Court is Plaintiffs' motion for a temporary restraining order and preliminary injunction. (Dkt. No. 11.) Having received briefing and heard oral argument, the Court denies Plaintiffs' motion for the reasons that follow.

## BACKGROUND[1]

### I.  The Governor's Executive Orders

The State of Illinois—along with the rest of the United States and indeed most of the world—currently finds itself in the midst of a global pandemic caused by the readily transmissible coronavirus SARS-CoV-2 and the potentially fatal disease it causes, COVID-19. As alleged by Plaintiffs, "[t]he pandemic has created an unprecedented emergency public health crisis that has left no one untouched and unaffected." (Compl. ¶ 2, Dkt. No. 1.) In an attempt to stem the tide of the crisis, the Governor has invoked his authority under the Illinois Emergency Management Agency Act ("EMAA"), 20 ILCS 3305/1 *et seq.*, to issue a series of proclamations and executive orders that, among other things, have restricted the activities of individuals and businesses for certain periods of time. (Compl. ¶ 3.) Those proclamations and executive orders may be summarized as follows:

- On March 9, 2020, the Governor issued a proclamation declaring a disaster in the form of a public-health emergency effecting all of Illinois's 102 counties. (*Id.* ¶¶ 50–52.)

- On March 20, 2020, the Governor issued Executive Order 2020-10 ("EO 2020-10"). (Compl. ¶¶ 53–61; *id.*, Ex. C, EO 2020-10, Dkt. No. 1-3.) EO 2020-10 ordered Illinois residents to shelter in place at their residences and forbade gatherings of more than ten people. EO 2020-10 also required restaurants to shut down all onsite consumption of food or beverages, but it allowed people to participate in outdoor recreation and to provide care to family members, friends, and pets in another household. EO 2020-10 also allowed persons in Illinois to leave the State.

- On April 1, 2020, the Governor issued a second proclamation, which would remain in effect for 30 days, declaring that a disaster continued to exist in Illinois. (Compl. ¶¶ 62–67;

---

[1] The facts summarized here are taken from Plaintiffs' verified complaint, *see Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017) (noting that a verified complaint is not just a pleading but also the equivalent of an affidavit), the parties' briefs supporting and opposing preliminary injunctive relief, and the accompanying exhibits. At this stage in the proceedings, the parties do not contest the factual record. Accordingly, although the Court heard oral argument, it did not hold an evidentiary hearing. *See Dexia Cred. Local v. Rogan*, 602 F.3d 879, 884 (7th Cir. 2010) (explaining that "the court need not conduct an evidentiary hearing unless one is called for as a result of a fact issue created by the response to a motion for a preliminary injunction").

*id.*, Ex. D, April 1st Proclamation, Dkt. No. 1-4.) That same day, the Governor issued Executive Order 2020-18 ("EO 2020-18"). (Compl. ¶¶ 68–79; *id.*, Ex. E, EO 2020-18, Dkt. No. 1-5.) EO 2020-18 continued and extended EO 2020-10, without alteration, until April 30, 2020. (*Id.*)

- On April 30, 2020, the Governor issued a third proclamation, which would also remain in effect for 30 days, declaring that a disaster continued to exist in Illinois. (Compl. ¶¶ 80–87; *id.*, Ex. F, April 30th Proclamation, Dkt. No. 1-6.) That same day, the Governor issued Executive Order 2020-32 ("EO 2020-32"). (Compl. ¶¶ 88–108; *id.*, Ex. G, EO 2020-32, Dkt. No. 1-7.) For the purposes of the instant motion, EO 2020-32 was functionally identical to EO 2020-10 and EO 2020-18.

- The Illinois General Assembly, which had been in recess since March 9, 2020, was in session from May 20 to May 23, 2020. (Compl. ¶¶ 109–10.) The General Assembly did not amend any of the Illinois statutes relevant to the Governor's emergency powers or approve the Governor's executive orders. (*Id.* ¶¶ 111–12.)

- On May 29, 2020, the Governor issued a fourth proclamation declaring that a disaster continued to exist in Illinois; this proclamation would also remain in effect for 30 days. (*Id.* ¶¶ 113–20; *id.*, Ex. H, May 29th Proclamation, Dkt. No. 1-8.) That same day, the Governor issued Executive Order 2020-38 ("EO 2020-38"). (Compl. ¶¶ 121–35; *id.*, Ex. I, Dkt. No. 1-9.) EO 2020-38 eliminated the requirement in the prior orders that Illinois residents shelter in place at their residences but continued to forbid gatherings of more than ten people. EO 2020-38 also permitted bars and restaurants in Illinois to allow customers to consume food and beverages in outdoor areas of their premises.

- Finally, after Plaintiffs filed their Complaint, the Governor issued a fifth proclamation on June 26, 2020, declaring that a disaster continues to exist in Illinois and stating that it will remain in effect for 30 days. (Resp. in Opp'n to Mot. for TRO, Ex. D, Dkt. No. 21-4.) That same day, the Governor issued Executive Order 2020-43 ("EO 2020-43"). (*Id.*, Ex. E, Dkt. No. 21-5.) EO 2020-43, which remains in force, permits gatherings of up to 50 people and allows indoor consumption of food and beverages at bars and restaurants as long as patrons maintain appropriate social distancing. EO 2020-43 has superseded the previous four executive orders.

For purposes of this opinion, the Court refers to the Governor's above-described executive orders collectively as the "Executive Orders." Although EO 2020-43 was issued after Plaintiffs filed their Complaint, the Court considers the present motion properly addressed to that latest Executive Order as well as its predecessors.[2]

---

[2] Motions for preliminary injunctive relief often concern rapidly changing situations, and it is appropriate for the Court to address changes in circumstance that have occurred after the complaint was filed but

## II.     The Plaintiffs

There are four Plaintiffs in this case. First, the Village is a home-rule municipality located in Cook and Will Counties in Illinois. (Compl. ¶ 6.) In April 2020, the Village published its own plan for reopening its businesses. (*Id.* ¶ 253.) The Village wishes to use that plan instead of following the Governor's Executive Orders. Other than complaining that the Village cannot use its own reopening plan, which would allow businesses to reopen on a faster timeline than the Executive Orders allow, Plaintiffs have not made any showing regarding what effects the Executive Orders have had on the Village or why the Village's plan is superior to the Executive Orders.

McMullen, the second Plaintiff, purports to bring suit as co-owner of a restaurant and pub called the Brass Tap. (*Id.* ¶ 7.) At the time Plaintiffs filed their Complaint on June 16, 2020, the Brass Tap had been closed to on-premises dining and consumption of alcoholic beverages since March 16, 2020. (*Id.* ¶ 138.) (As discussed above, Executive Order 2020-43 subsequently loosened this restriction.) The Brass Tap did not consent to its closure and did not receive written notice of the closure, written notice of its rights, or a closure order from a court. (*Id.* ¶¶ 139–46.) Plaintiffs allege that, as a result of the Executive Orders, the Brass Tap has suffered a "catastrophic loss of income." (*Id.* ¶ 147.) During the time period when it was limited to curbside pickup and delivery, the restaurant lost about 85% of its revenue. (*Id.* ¶ 148.) Even after it was

---

before final judgment has been rendered. *See Chi. United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 948 (7th Cir. 2006). Moreover, at least for purposes of the present motion, the Governor does not contend that Plaintiffs' claims are moot to the extent they are directed toward Executive Orders no longer in effect. Such an argument would likely fail in any case, as the record does not make absolutely clear that it would be unreasonable to expect the Governor to reimpose some aspects of the previous Executive Orders. *See Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 345 (7th Cir. 2020) ("Voluntary cessation of the contested conduct makes litigation moot only if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'") (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000)). Indeed, defense counsel acknowledged during oral argument that, if public-health conditions change, the Governor might reimpose some aspects of the previous Executive Orders.

allowed to open for outdoor dining under EO 2020-38, the Brass Tap only brought in about 60% of the revenue it had before the Governor first ordered Illinois residents to shelter in place. (*Id.*) In addition, the restaurant had to throw out spoiled food and drink worth between $1,000 and $1,500. (*Id.*) The record reveals nothing about how the Brass Tap has fared since the Complaint was filed. But it is undisputed that Illinois has allowed indoor dining at bars and restaurants, with mandatory social distancing, since EO 2020-43 went into effect on June 26, 2020.

The third Plaintiff, Buban, claims that he has been isolated at his residence in the Village since the Governor issued EO 2020-10 on March 20, 2020. (*Id.* ¶ 151.) He did not consent to this isolation, and at no point has he received written notice from the state or a written statement of his rights. (*Id.* ¶¶ 152–56.) Plaintiffs allege that due to the Executive Orders, Buban has been unable to visit immediate family members who live in another town or to engage in daily activities outside of his home. (*Id.* ¶¶ 157–58.) Similarly, Solek, the fourth Plaintiff, also claims that he has been isolated at his residence in the Village since March 20. (*Id.* ¶ 160.) He did not consent to the isolation or receive written notice or a written statement of his rights. (*Id.* ¶¶ 161–65.) Plaintiffs allege that this isolation has prevented Solek from visiting family or friends and from engaging in a cardiovascular workout exercise program recommended by his cardiologist. (*Id.* ¶¶ 166–68.) The Court observes, however, that the Executive Orders, on their faces, do not prohibit all contact with friends or family members, all activities outside the home, or cardiovascular exercise (although it is certainly fair to say that the Executive Orders restrict the manner in which those activities may be carried out). And Plaintiffs do not allege how the restrictions in the Executive Orders prevent Solek and Buban from seeing friends or family or prevent Solek from engaging in exercise recommended by his doctor.

### III.     The Complaint

Plaintiffs' Complaint contains eleven counts—four arising under federal law (Counts I through IV) and seven under Illinois state law (Counts V through XI).

In Count I, Solek and Buban assert that the Governor violated their procedural due process rights under the Fourteenth Amendment by failing to comply with the requirements of the IDPHA when he issued the Executive Orders. In Plaintiffs' view, the Governor was required to obtain either their consent or authorization from a court of competent jurisdiction to require them to isolate at their homes.

Count II consists of McMullen's claim on behalf of the Brass Tap for the alleged violation of that establishment's procedural due process rights under the Fourteenth Amendment.[3] Similar to the allegations in Count I, McMullen contends that the IDPHA required the Governor to obtain consent or authorization from a court of competent jurisdiction to order the Brass Tap to stop serving customers on its premises or to limit or eliminate service in indoor areas.

Count III asserts that the Governor has infringed upon Buban's and Solek's substantive due process rights under the Fourteenth Amendment. Specifically, Plaintiffs allege that Buban and Solek have a "fundamental right and property interest to live and work" and that the Executive Orders "force individuals to stay at home, and force certain businesses to remain closed and others to operate under significant restrictions, and therefore by extension limit an individuals' [*sic*] ability to work." (*Id.* ¶¶ 197, 199.)

---

[3] The headings to Counts II and IV indicate that those counts concern the Brass Tap only. But the Brass Tap itself does not appear to be a named Plaintiff. *See* Fed. R. Civ. P. 10(a) ("The title of the complaint must name the parties."). Presumably, this claim is intended to be brought by McMullen as co-owner of the Brass Tap.

Count IV, the last of the federal claims, asserts that the Governor has violated the Brass Tap's rights under the Equal Protection Clause of the Fourteenth Amendment by treating restaurants and bars differently than other types of businesses under the Executive Orders.

The remainder of Plaintiffs' claims arise under the constitution and laws of the State of Illinois. In Counts V and VI, Plaintiffs allege that the Governor violated Buban's, Solek's, and the Brass Tap's due process rights under Article I, Section 2 of the Illinois Constitution. Count VII, which appears to be asserted on behalf of all Plaintiffs, alleges that the Governor violated Article V, Section 11 of the Illinois Constitution by issuing Executive Orders that exceed his authority. In Count VIII, which appears to be asserted on behalf of the Village only, Plaintiffs allege that the Governor has violated the Village's rights as a home-rule municipality pursuant to Article VII, Section 6 of the Illinois Constitution. Count IX, which appears to be brought on behalf of all Plaintiffs, alleges that the Governor violated Article II, Section 1 and Article V, Section 11 of the Illinois Constitution by failing to present the Executive Orders to the Illinois General Assembly for approval. Count X, which appears to be brought on behalf of the Village only, requests a declaratory judgment to the effect that the Executive Orders impose an unlawful unfunded mandate on the Village by requiring it to commence law enforcement operations without providing funding to do so. And finally, in Count XI, Plaintiffs assert that the Governor violated the IDPHA by issuing Executive Orders requiring individuals to isolate and nonessential business to close without their consent or a court order.

**DISCUSSION**

## I.      Standard for Preliminary Injunctive Relief

To obtain a temporary restraining order or preliminary injunction pursuant to Federal Rule of Civil Procedure 65, a plaintiff "must establish that it has some likelihood of success on the

merits; that it has no adequate remedy at law; [and] that without relief it will suffer irreparable harm." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (internal quotation marks and citation omitted).[4] If the plaintiff fails to meet any of those threshold requirements, the Court must deny preliminary injunctive relief. *Id.* But if the plaintiff can demonstrate those requirements, then the Court "must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *Id.* (internal quotation marks and citation omitted). In this Circuit, courts employ a "sliding-scale approach": the more likely plaintiff is to prevail on the merits, the less the balance of harms must weigh in his or her favor; correspondingly, the less likely a plaintiff is to prevail the more the balance must weigh in his or her favor. *Id.*; *see also Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) ("Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if it court were to grant the requested relief."); *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001) (explaining that under the "sliding-scale approach," "the more likely the plaintiff [is to] succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position"). In applying this standard, the Court is mindful that granting preliminary injunctive relief "is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1085 (internal quotation marks and citation omitted); *see also Whitaker v. Kenosha Unified Sch.*

---

[4] The standards for issuing temporary restraining orders and preliminary injunctions are the same. *See, e.g.*, *Chicago Teachers Union v. DeVos*, No. 20-cv-02958, --- F. Supp. 3d ---, 2020 WL 3404749, at *3 (N.D. Ill. June 19, 2020); *USA-Halal Chambers of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019) (collecting cases).

*Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017) (explaining that a preliminary injunction "is an extraordinary remedy" that "is never awarded as a matter of right").

## II.     Standing

Before turning to the requirements for preliminary injunctive relief, the Court will briefly address the Governor's suggestion that McMullen lacks standing to bring his claims in this suit. This argument is raised in a footnote in the Governor's opposition brief (*see* Governor's Mem. in Opposition to Pl.'s Mot. at 9 n.13, Dkt. No. 21), and Plaintiffs do not respond to it in their reply brief. As a result, the record and arguments on this point are underdeveloped. Nonetheless, to the extent McMullen lacks constitutional standing to bring his claims, it would present a matter of subject-matter jurisdiction that this Court is obligated to examine. *See Silha v. ACT, Inc.*, 807 F.3d 169, 172–73 (7th Cir. 2015); *Craig v. Ontario Corp.*, 543 F.3d 872, 877 (7th Cir. 2008).

As an initial matter, it is unclear whether McMullen seeks to bring claims on his own behalf, on behalf of the Brass Tap, or both. McMullen is described in the caption to the Complaint as proceeding as "Tom McMullen, as owner of the Brass Tap." Then, in the section of the Complaint that recites the various counts, the captions for Counts II, IV, and VI indicate that those counts relate to "The Brass Tap." None of the counts indicate that they are brought by McCullen on his own behalf, and he is not included under the counts brought by Solek and Buban as "Individual Residents." This raises two questions: whether McMullen has standing and whether he is the real party in interest for the claims.

The standing requirement is grounded in the Constitution's limitation of federal judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2; *see Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 473 (7th Cir. 2012). To have standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that

is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The Governor has raised a facial challenge to McMullen's standing; to survive it, McMullen need only have adequately pleaded a basis for standing. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009). At issue is whether McMullen has pleaded an injury in fact. Indirect financial injuries that shareholders suffer as a result of injuries to corporations in which they have an equity stake may sometimes suffice for this purpose. *See Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 756 (7th Cir. 2008) (finding that the plaintiff satisfied the minimum requirements of constitutional standing by virtue of an asserted indirect injury as a corporation's sole shareholder). Here, while the Complaint does not explicitly allege that McMullen himself was injured as a result of the restrictions on his business, such an injury may be plausibly inferred from the allegations of harm to the Brass Tap and the allegation that McMullen is the co-owner of the business with his wife. *See Korte v Sebelius*, 735 F.3d 654, 667 (7th Cir. 2013); *G & S Holdings LLC v Cont'l Cas. Co.*, 697 F.3d 534, 540 (7th Cir. 2012). That is sufficient at this early stage in the proceedings.

Apart from the constitutional standing issue, there is at least some question as to whether McMullen is the real party in interest for claims based on the effect of the Executive Orders on the Brass Tap. *See* Fed. R. Civ. P. 17(a)(1) ("An action must be prosecuted in the name of the real party in interest."); *Frank v. Hadesman & Frank, Inc.*, 83 F.3d 158, 160 (7th Cir. 1996) ("Illinois follows the widespread rule that an action for harm to the corporation must be brought in the corporate name."). The Governor's counsel suggested during oral argument that information in the Illinois Secretary of State's databases indicates that the Brass Tap is organized as a corporation. A shareholder generally may sue to vindicate a corporation's rights only if the corporation refuses to sue in bad faith, the shareholder has suffered some injury distinct from the

injuries suffered by all shareholders, or the wrongdoer has a special contractual obligation to the shareholder. *See Rawoof*, 521 F.3d at 756. Plaintiffs have made no showing that any of these exceptions apply.

But even if McMullen is not the real party in interest for any claim based on harm to the Brass Tap, those claims would not be dismissed until Plaintiffs had been given an opportunity to amend the complaint to add the proper party. *See* Fed. R. Civ. P. 17(a)(3) ("The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action."). And the Court has no reason to believe that Plaintiffs would not be able to do so. Accordingly, the Court does not find this issue particularly informative for purposes of the present analysis. If anything, however, this potential flaw suggests a lower likelihood of success on the merits of the claims relating to the Brass Tap.

### III.     Likelihood of Success on the Merits

#### A.     Exercise of State Authority During a Public-Health Crisis

The Court now turns to Plaintiffs' likelihood of success on the merits of their federal claims. In doing so, it is necessary to consider the context in which this case arises. As courts in this District and elsewhere have explained, "the Constitution does not compel courts to turn a blind eye to the realities of the COVID-19 crisis." *Cassell v. Snyders*, No. 20-cv-50153, --- F. Supp. 3d ---, 2020 WL 2112374, at *6 (N.D. Ill. May 3, 2020). Plaintiffs do not dispute the seriousness of the public-health threat posed by COVID-19: Illinois, along with the rest of the nation, finds itself in the midst of an ongoing public-health emergency involving a potentially deadly infectious disease. The Centers for Disease Control and Prevention reported 4,225,687

total cases of COVID-19 in the United States, including 146,546 deaths, through July 27, 2020.[5] In Illinois alone, there have been over 172,000 confirmed cases and more than 7,400 deaths.[6] Data indicates that the pandemic is far from over—new COVID-19 cases nationwide recently hit a daily highpoint on July 24, 2020, with 74,818 new cases.[7] On that date, there were 1,532 new cases in Illinois.[8] In response to the COVID-19 pandemic, state and local governments across the country have imposed sweeping protective measures and, in some cases, reimposed those measures after loosening prior restrictions only to see infection rates increase again.

The United States Supreme Court has long recognized that traditional constitutional analyses give way to a more deferential approach when courts evaluate the emergency exercise of state action during a public-health crisis. In *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the Supreme Court rejected a Fourteenth Amendment challenge to a Massachusetts state statute allowing localities to require that residents receive vaccinations against infectious diseases. The *Jacobson* Court recognized the need to "guard with firmness every right appertaining to life, liberty, or property as secured to the individual by the supreme law of the land," but nonetheless found that, in matters concerning the safety and health of the people, the national government "should not invade the domain of local authority except when it is plainly necessary to do so in order to enforce that law." *Id.* at 38. Accordingly, when faced with an epidemic of disease threatening the safety of the people, federal courts review the constitutionality of state emergency

---

[5] *See Coronavirus Disease 2019 (COVID-19): Cases in the U.S.*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 28, 2020).

[6] *Coronavirus Disease 2019 (COVID-19) in Illinois*, Ill. Dep't of Pub. Health, http://www.dph.illinois.gov/covid19 (last visited July 28, 2020).

[7] *See Coronavirus Disease 2019 (COVID-19): Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 28, 2020).

[8] *Coronavirus Disease 2019 (COVID-19) in Illinois*, Ill. Dep't of Pub. Health, http://www.dph.illinois.gov/covid19 (last visited July 28, 2020).

measures only for whether they have "no real or substantial relation to those objects" or are "beyond all question, a plain, palpable invasion of rights secured by the [Constitution]." *Id.* at 31; *see also Cassell*, 2020 WL 2112374, at *6 (quoting *Jacobson,* 197 U.S. at 31).[9]

This Court finds that the COVID-19 pandemic constitutes the very sort of extraordinary threat to public health and safety contemplated by the Supreme Court in *Jacobson*. Thus, in reviewing Plaintiffs' claims arising under the United States Constitution, this Court properly asks only whether the Executive Orders have a real or substantial relationship to preventing the spread of COVID-19 or beyond all question plainly and palpably invade Plaintiffs' constitutional rights. *See Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 347 (7th Cir. 2020) (7th Cir. June 16, 2020); *In re Abbott*, 954 F.3d 773, 784 (5th Cir. 2020); *see also S. Bay United Pentecostal Church v. Newsom*, No. 19A1044, 2020 WL 2813056, at *1–2 (U.S. May 29, 2020) (Roberts, C.J., concurring). The Governor's actions easily survive that test. The Executive Orders—which limit groups of people from gathering, especially in indoor spaces—undoubtedly have a real and substantial relationship to preventing the spread of COVID-19, a disease which spreads primarily from close contact in indoor spaces.[10] As explained by the Seventh Circuit in *Elim Romanian Pentecostal Church*, the Executive Orders differentiate between different types of establishments and gatherings based on factors such as whether the functions and activities that

---

[9] *Jacobson* does not, of course, give state actors free reign to disregard constitutional rights simply by declaring a public-health emergency. "*Jacobson*'s reach ends when the epidemic ceases; after that point, government restrictions on constitutional rights must meet traditionally recognized tests. And so, courts must remain vigilant, mindful that government claims of emergency have served in the past as excuses to curtail constitutional freedoms." *Cassell*, 2020 WL 2112374, at *7.

[10] *See Coronavirus Disease 2019 (COVID-19): Deciding to Go Out*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/deciding-to-go-out.html (last visited July 28, 2020); *Coronavirus Disease 2019 (COVID-19): About COVID-19*, Ill. Dep't of Pub. Health, http://www.dph.illinois.gov/topics-services/diseases-and-conditions/diseases-a-z-list/coronavirus/symptoms-treatment (last visited July 28, 2020).

typically take place there are essential and must be carried out in person, whether people come together in large groups or remain in close proximity for extended periods of time, and whether those present are likely to engage in conduct that elevates the risk of transmitting the virus. 962 F.3d at 346–47.

In short, given the extraordinary, ongoing public-health threat posed by COVID-19, this Court concludes that any infringement of Plaintiffs' federal constitutional rights would be permissible under *Jacobson*, and thus Plaintiffs have a negligible likelihood of success on the merits of those claims. But even if *Jacobson* did not govern, Plaintiffs have not demonstrated a likelihood of success on the merits of any of their federal claims based on traditional constitutional analyses.

### B.    Federal Procedural Due Process Claims (Counts I and II)

Counts I and II of the Complaint consist of federal procedural due process claims brought by Buban, Solek, and the Brass Tap. To determine whether a plaintiff's procedural due process rights have been violated, the Court asks, first, whether the plaintiff has been deprived of a protected liberty or property interest, and second, whether that deprivation occurred without due process of law. *GEFT Outdoors*, 922 F.3d at 365. To determine whether a state actor has deprived a plaintiff of a liberty or property interest without due process, the Court employs a three-factor test, weighing "the nature of the private interest at stake, the risk of decisional error, and the government's interest." *Vargas v. Cook Cty. Sheriff's Merit Bd.*, 952 F.3d 871, 874 (7th Cir. 2020) (citing *Mathews v. Eldrige*, 424 U.S. 319, 335 (1976)).

It is not entirely clear from the Complaint what liberty or property interests Plaintiffs view as being at stake. In their opening brief, Plaintiffs describe their liberty interest as "the right of the citizen to be free in the enjoyment of all his faculties, to be free to use them in all lawful ways; to

live and work where he will; to earn his livelihood by any lawful calling." (Pl.'s Mem. of Law in

Support of the Mot. for TRO and Preliminary Injunction ("Pls.' Mem.) at 8, Dkt. No. 11-2.)

(quoting *Allegeyer v. State of Louisiana*, 165 U.S. 578, 589 (1897).) When asked during oral

argument, Plaintiffs' counsel also pointed to the right to travel and freedom of association. Thus,

the Court considers that Plaintiffs may be asserting rights to work, rights to travel, or rights to

freedom of association. Whatever liberty or property interests are at issue, however, Plaintiffs

have demonstrated little likelihood of success on the merits of their federal procedural due process

claim because they have not shown that they were deprived of those interests without due process

of law.

Plaintiffs contend that they should have received the same notice and opportunity to be

heard prior to the issuance of the Executive Orders as provided to people and businesses prior to

orders of quarantine, isolation, and shutdown under the IDPHA. In short, Plaintiffs complain that

the Governor failed to comply with the requirements of Illinois state law prior to issuing the

Executive Orders. But "there is no constitutional procedural due process right to state-mandated

procedures." *GEFT Outdoors*, 922 F.3d at 366; *see also Charleston v. Bd. of Trs. of Univ. of Ill. at

Chi.*, 741 F.3d 769, 773 (7th Cir. 2013) ("[W]e will be clear once more: a plaintiff does not have a

federal constitutional right to state-mandated procedures."); *River Park, Inc. v. City of Highland

Park*, 23 F.3d 164, 166–67 (7th Cir. 1994) ("Failure to implement state law violates that state law,

not the Constitution; the remedy lies in state court."). So even if Plaintiffs are ultimately correct

that the Governor should have complied with the procedures set out in the IDPHA in

implementing his response to COVID-19, they still will not have established a federal

constitutional violation.

Moreover, applying the three-factor *Mathews* test, the Court concludes that Plaintiffs' post-deprivation ability to challenge the Executive Orders is likely constitutionally sufficient. Even accepting for the sake of argument that the nature of the private interests at stake weighs in Plaintiffs' favor, that factor cannot overcome the minimal risk of decisional error and the state's overwhelming interest in protecting public health and safety during an ongoing pandemic. The Court notes that "procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). In the present case, the individualized notice and pre-deprivation hearings for which Plaintiffs advocate would be unlikely to decrease the risk of the erroneous deprivation of rights, as all persons and businesses falling within the same broad categories are treated the same under the Executive Orders and thus an error as to one would be an error as to all. Meanwhile, the Governor makes a compelling case that holding individualized pre-deprivation hearings for each affected person and business would overwhelm the administrative system and cripple the state's ability to act quickly and decisively to contain a rapidly spreading disease. Meanwhile, as to the third *Mathews* factor, the state's interest in protecting public health and safety is extremely robust. *See Jacobson*, 197 U.S. at 29–31. Pre-deprivation hearings would almost certainly render the state's response to the COVID-19 pandemic ineffective, causing immense harm to thousands of Illinois residents.

Because the second and third factors in the *Mathews* test weigh heavily against the need for pre-deprivation process, the Court concludes that Plaintiffs have, at best, a negligible chance of prevailing on the merits of their federal procedural due process claims. Plaintiffs' only meaningful argument to the contrary relies on the Governor's purported violation of state law, which, as discussed above, cannot form the basis for a federal procedural due process claim.

### C. Substantive Due Process Claim (Count III)

Count III consists of a federal substantive due process claim under the Fourteenth Amendment brought by Buban and Solek. "The substantive component of the Due Process Clause bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *GEFT Outdoors*, 922 F.3d at 368 (internal quotation marks and citation omitted); *see also Belcher v. Norton*, 497 F.3d 742, 753 (7th Cir. 2007) (explaining that the substantive due process requirement "protects an individual from the exercise of governmental power without a reasonable justification"). The scope of substantive due process protection is, however, "very limited." *Campos v. Cook County*, 932 F.3d 972, 975 (7th Cir. 2019); *see also Belcher*, 497 F.3d at 753. "Unless a governmental practice encroaches on a fundamental right, substantive due process requires only that the practice be rationally related to a legitimate government interest, or alternatively phrased, that the practice be neither arbitrary nor irrational." *Platt v. Brown*, 872 F.3d 848, 852 (7th Cir. 2017); *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014) (explaining that even when fundamental rights are not involved, there is nonetheless a "residual substantive limit on government action which prohibits arbitrary deprivations of liberty by government").

The Governor argues that Plaintiffs have failed to identify a fundamental right violated by the Executive Orders, and therefore rational-basis review governs their substantive due process claim. The Supreme Court has limited fundamental rights to those protected by the Bill of Rights and certain other unenumerated rights such as "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Hayden*, 743 F.3d at 576 (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). As mentioned above, Plaintiffs are not entirely clear what liberty interests they

believe have been unconstitutionally infringed. But they have suggested infringement of their rights to work, rights to travel, and rights to freedom of association.

To the extent Plaintiffs assert a right to work, while occupational liberty has long been recognized as protected by the Due Process Clause, *see Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992) (noting that "[t]he concept of liberty protected by the due process clause has long included occupational liberty—'the liberty to follow a trade, profession, or other calling'"), the Seventh Circuit has held that any due process claim based on that liberty interest must be "confined to a claim under procedural due process; there is no such cause of action under substantive due process." *Zorzi v. Cty. of Putnam*, 30 F.3d 885, 895 (7th Cir. 1994). Accordingly, any purported right to work cannot support Plaintiffs' substantive due process claim.

With respect to the right to travel, the Seventh Circuit has recognized a fundamental right to ***inter***state travel. *Andre v. Bd. of Trs. of Vill. of Maywood*, 561 F.2d 48, 52 (7th Cir. 1977) ("The right to travel interstate, although nowhere expressed in the Constitution, has long been recognized as a basic fundamental right."). But neither Buban nor Solek alleges that the Executive Orders prevented them from traveling to other states. Meanwhile, the status of a fundamental right to ***intra***state travel is unsettled in this Circuit. *See Hannemann v. S. Door Cty. Sch. Dist.*, 673 F.3d 746, 756 (7th Cir. 2012) (declining to opine on the existence of a federal fundamental right to intrastate travel). Regardless of whether such a federal fundamental right exists, neither Buban nor Solek has made any showing that he has actually been prevented from traveling from place to place within Illinois. *See id.* at 756–57. While the Complaint alleges that the Executive Orders have kept Buban and Solek "isolated" at home, even the earliest Executive Order allowed individuals to see each other, in groups of ten or less and at an appropriate distance, in outdoor spaces and to take care of (or receive care from) relatives and friends. (Compl., Ex. C, EEO 2020-

10 ¶ 5.) The Executive Orders have become less restrictive with respect to gatherings over time, such that the current version allows gatherings of up to 50 people. (Resp. in Opp'n, Ex E ¶ 2(d).) Indeed, when asked during oral argument, Plaintiffs' counsel could not identify any particular place Plaintiffs desired to go but believed they could not under the current Executive Order.

To the extent the Executive Orders interfered with Plaintiffs' lives, it did so by requiring the closure of particular businesses—such as gyms or athletic facilities—not by forbidding travel. Even if Plaintiffs have a fundament right to travel within Illinois, it is unlikely that right includes access to private places of business, which appears to be Plaintiffs' underlying concern. *See id.* at 757. (explaining that even as recognized in other circuits, "[t]he right to intrastate travel protects the right to move from place to place, not the right to access certain public places"); *see also Williams v. Town of Greenburgh*, 535 F.3d 71, 75–76 (2d Cir. 2008) ("[I]t is clear that the right [to intrastate travel] protects **movement between places** and has no bearing on **access** to a particular place.")

That leaves Plaintiffs' potential substantive due process claim based upon infringement of Buban's and Solek's rights to freedom of association. "The Supreme Court has recognized two kinds of constitutionally-protected association: intimate association and expressive association." *Goodpaster*, 736 F.3d at 1072. The former concerns the right to enter into and maintain intimate human relationships; the latter "ensures the right to associate for the purposes of engaging in activities protected by the First Amendment," *i.e.*, to come together for the purpose of engaging in some form of public or private expression. *Id.* at 1072–73. Once again, Plaintiffs have made no showing that the Executive Orders actually prohibit any of Buban's or Solek's desired associations. A desire to socialize with friends and acquaintances generally will not suffice. *See id.* at 1072.

Moreover, even assuming that the Executive Orders do infringe on Buban's and Solek's rights of association, the restrictions imposed by the Governor are facially neutral and advance a compelling state interest: preventing the spread of a dangerous infectious disease. *See Vasquez v. Foxx*, 895 F.3d 515, 525 (7th Cir. 2018). And the Executive Orders have been narrowly tailored toward that end. *See Reno v. Flores*, 507 U.S. 292, 301–02 (1993) (explaining that government infringement of a fundamental right must be "narrowly tailored to serve a compelling state interest"). To the extent there is no fundamental right at stake, the Executive Orders easily satisfy rational-basis review. As the Seventh Circuit recently recognized, the protective measures imposed by the Governor—including limiting the maximum size of gatherings and adopting a policies of social distancing—have been endorsed by experts as effective means of slowing the spread of COVID-19. *See Elim Romanian Pentecostal Church*, 962 F.3d at 342 (discussing the threat of COVID-19 and expert guidance on preventative measures). There can be no doubt that the measures are rationally related to a legitimate state interest. As with their procedural due process claim, Plaintiffs' argument to the contrary relies heavily on their contention that the Governor should have complied with the requirements of the IDPHA. But the state's enactment of the IDPHA did not render all other approaches to addressing public-health concerns irrational and certainly did not make them unconstitutional.

For all of these reasons, the Court finds that Plaintiffs also have a negligible likelihood of success on the merits of their substance due process claim.

### D. Equal Protection Clause Claim (Count IV)

Count IV consists of an equal protection claim brought by McMullen on behalf of the Brass Tap. With this claim, Plaintiffs contend that the Governor has denied the Brass Tap equal

protection of the laws by imposing greater restrictions on restaurants and bars than other establishments, such as grocery stores, salons, churches, or offices.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall make or enforce a law that "den[ies] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. "This is essentially a direction that all persons similarly situated should be treated alike." *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1008 (7th Cir. 2019) (internal quotation marks and citation omitted). In considering a claim based on the Equal Protection Clause, courts apply strict scrutiny—the most exacting degree of scrutiny—"only if the state-crafted classification disadvantages a suspect class or impermissibly interferes with a fundamental right." *Id.* (internal quotation marks omitted). Distinguishing bars and restaurants from other types of establishments does not constitute a suspect classification. *See Goodpaster*, 736 F.3d at 1071. And Plaintiffs do not raise any equal protection argument based on the infringement of a fundamental right. Therefore, rational-basis review applies to the state action at issue, and the Executive Orders will survive constitutional review as long as their restrictions bear a rational relationship to some legitimate end. *See id.*

Plaintiffs contend that the Executive Orders "disadvantage certain businesses and restrain[] the choices of individual patrons without thought to whether it is necessary for the protection of public health." (Pl.'s Mem. at 8.) The Court disagrees. There is no doubt that the state has a legitimate interest in containing the spread of COVID-19, a potentially deadly disease that poses a serious threat to the public health. Although public-health officials still have much to learn about the disease and how it is transmitted, experts believe that the virus that causes COVID-19 is both highly-contagious and can be transmitted by people who are asymptomatic.

While Plaintiffs assert that there is no reason to treat restaurants and bars differently than, for example, salons, churches, office buildings, or grocery stores, the Governor has articulated rational bases for the distinctions in the Executive Orders. *See Goodpaster*, 736 F.3d at 1072 (explaining that for purposes of rational-basis review, the reviewing court need only find a reasonably conceivable state of facts that could provide a rational basis for the classification; the actual motivation (or lack thereof) for the state action is immaterial). It was rational for the Governor to weigh the benefits of a reduced infection rate against the costs of limiting activities that pose a high risk of transmission in crafting the state's response to COVID-19. In doing so, it was rational for the Governor to distinguish between restaurants and salons because people do not congregate in large numbers for extended periods of time in salons as they do in restaurants, and salon patrons can wear masks while receiving most services whereas restaurant patrons must take off their masks to eat and drink. Similarly, in distinguishing between restaurants and churches, it was rational for the Governor to take into account the feasibility of reducing close contact during religious services, which is more difficult in restaurants, and the fact that practicing a religion is a fundamental right, while dining out is not. It was also rational for the Governor to treat restaurants and bars differently than grocery stores because eating at a restaurant or drinking at a bar is a luxury compared to buying food and other household essentials at a grocery store, one of the most essential activities of everyday life. Moreover, the Governor rationally tailored the restrictions on restaurants to allow carryout and delivery services to continue even prior to allowing resumption of limited dine-in service. With respect to office buildings, the Governor points out that they house a broad range of essential businesses and critical industries. Even so, under the Governor's plan, companies have been encouraged to operate at a reduced office capacity, with employees working remotely from home.

The Court will not belabor its point further by listing the many rational bases for the distinctions drawn among different types of business in the Executive Orders. For purposes of Plaintiffs' present motion for preliminary injunctive relief, it suffices to say that the Executive Orders survive rational-basis review and thus Plaintiffs have failed to demonstrate a greater than negligible likelihood of success on the merits of their claim that the Brass Tap has been denied equal protection of the laws.

### E.     State-Law Claims (Counts V–XI)

In addition to the four federal claims, Plaintiffs assert seven claims under Illinois state law in Counts V through XI. For purposes of the instant motion, the Governor does not challenge the state-law claims on their merits. Instead, he asserts that Plaintiffs are barred by the doctrine of sovereign immunity from bringing those claims against him in federal court. The Court agrees.

"[T]he principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Article III . . . ." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984); *see* U.S. Const. amend. XI. Put simply, the Eleventh Amendment grants states immunity from suit in federal court unless the state consents to the suit or Congress has abrogated the state's immunity. *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996); *Nuñez v. Ind. Dep't of Child Servs.*, 817 F.3d 1042, 1044 (7th Cir. 2016); *see also Pennhurst*, 465 U.S. at 100 ("This Court's decisions thus establish that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state.") (internal quotation marks and citation omitted). This immunity applies regardless of the nature of the relief sought. *Pennhurst*, 465 U.S. at 98. Moreover, sovereign immunity not only bars suits in which the state itself is named as a defendant; it also bars suits in which a state official is the named defendant but any relief would operate against the state itself. *Id.* at 101. A suit against a state official acting in

his official capacity is generally considered a suit against the state for which principles of sovereign immunity apply. *Joseph v. Bd. of Regents of Univ. of Wisconsin Sys.*, 432 F.3d 746, 748 (7th Cir. 2005) (explaining that "state officials in their official capacities are also immune from suit under the Eleventh Amendment").

Sovereign immunity does not preclude suits for prospective relief against state officials who act in violation of the United States Constitution, however. *Edelman v. Jordan*, 415 U.S. 651, 666–67 (1974); *Ex parte Young*, 209 U.S. 123, 160 (1908). Accordingly, the Governor has not invoked sovereign immunity as a defense to Plaintiffs' federal constitutional claims. But, as the Supreme Court explained in *Pennhurst*, when a plaintiff sues a state official in federal court for violating state law, "the entire basis for the doctrine of *Young* and *Edelman* disappears." *Pennhurst*, 465 U.S. at 106. Because there is no "greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law," *Young* and *Edelman* are "inapplicable in a suit against state officials on the basis of state law." *Id.*; *see also Elim Romanian Pentecostal Church*, 962 F.3d at 345. Counts V through XI of Plaintiffs' Complaint assert claims against the Governor in his official capacity for alleged violations of Illinois state law. Thus, sovereign immunity bars those claims from proceeding here.

Plaintiffs raise three arguments for why sovereign immunity should not bar their state-law claims against the Governor notwithstanding the fact that he has been sued in his official capacity. None are persuasive. First, Plaintiffs contend that an injunction against the Governor in this case would not operate against the state because the Governor acted *ultra vires* when he issued the Executive Orders. But a public official only acts *ultra vires* for purposes of sovereign immunity when he acts without any authority whatsoever. *Pennhurst*, 465 U.S. at 101 n.11 (citing *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697 (1982)). A public official's error in analyzing

the scope or extent of his powers does not make his actions *ultra vires. See id.*; *see also id.* at 106–116 (rejecting a broader conception of when a public official acts *ultra vires*). Here, the Governor was not acting without any authority whatsoever. To the contrary, by statute, the Governor has sweeping powers in the event a disaster strikes all or part of Illinois. *See* 20 ILCS 3305/7. While it is within the realm of possibility that he has exceeded his statutory powers or violated the Illinois Constitution by issuing the Executive Orders, the Governor nonetheless was acting pursuant to an Illinois statute and a mistake in understanding the scope of his powers under that statute would not render his actions *ultra vires*.

Second, Plaintiffs argue that the Governor should not be permitted to assert sovereign immunity as a defense to their state-law claims because those claims are closely intertwined with their four federal claims. Plaintiffs have cited no case law supporting that proposition, however, and this Court is not aware of any. To the contrary, it is not uncommon for federal courts to find that state-law claims against a state official are barred by sovereign immunity even while continuing to exercise jurisdiction over federal claims based on the same conduct. *See Elim Romanian Pentecostal Church*, 2020 WL 3249062, at *4; *Cassell*, 2020 WL 2112374, at *11.

Finally, Plaintiffs contend that sovereign immunity does not preclude the Village from suing the Governor in federal court because the Village is a home-rule municipality under the Illinois Constitution. The Illinois Constitution provides that municipalities with populations greater than 25,000, such as the Village, are home-rule units for purposes of state law. Ill. Const. art. VII, § 6(a). In most areas of the law, home-rule units have legislative powers concurrent with those of the Illinois General Assembly. *Id.* Nonetheless, the Illinois General Assembly may override or preempt the ordinances of a home-rule unit by a three-fifths majority in both chambers. *Id.* § 6(g), (l).

Plaintiffs assert that the doctrine of sovereign immunity does not preclude suits against the state by a home-rule municipality because the Illinois Constitution treats home-rule municipalities as the functional equivalents of states. Indeed, the United States Constitution does not preclude one state from suing another. U.S. Const. art. III, § 2; *see, e.g.*, *Florida v. Georgia*, 138 S. Ct. 2502 (2018). But Plaintiffs have pointed to no authority supporting the proposition that the Illinois state legislature can vest a municipality with sovereignty such that the municipality becomes a "state" for purposes of deciding rights under the United States Constitution. That idea runs contrary to the federal constitutional scheme in which only Congress—and not the states—can create new states. *See* U.S. Const. art. IV, § 3. States lack the power to create new sovereigns. *Cf. United States ex rel. Chandler v. Cook County*, 277 F.3d 969, 980–81 (7th Cir. 2002) (holding that Illinois home-rule units are presumed to be "persons" for purposes of federal statutes but states are not because they are sovereign).

Furthermore, the suggestion that Illinois has made the Village coequal with Illinois is belied by their relative authority and powers. Even as a home-rule unit, the Village has more limited legislative powers than the state, and in many circumstances the Illinois General Assembly can override its ordinances. *See* Ill. Const. art. VII, § 6. Moreover, an amendment to the Illinois Constitution could eliminate home-rule units but could not eliminate the state itself. *See Texas v. White*, 74 U.S. (7 Wall.) 700, 725 (1868) ("The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States."). In addition, municipalities cannot assert sovereign immunity as a defense*, see Alden v. Maine*, 527 U.S. 706, 756 (1999), and Plaintiffs have provided no authority for the proposition that home-rule units in Illinois should be treated any differently. To the contrary, there have been numerous suits against Illinois home-rule units in federal court, and the Court could find no cases where those units asserted sovereign

immunity as a defense—let alone prevailed on that defense. *See, e.g.*, *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 497 (7th Cir. 2017); *Social Bicycles LLC v. City of Chi. Dep't of Transp.*, 435 F. Supp. 3d 933, 938 (N.D. Ill. 2020). If the Village does not qualify as a state for purposes of asserting sovereign immunity as a defense, it stands to reason that the Village should not be treated as a state when it brings suit as the plaintiff.

In short, the Court concludes that Eleventh Amendment sovereign immunity bars Plaintiffs from pursuing their state-law claims against the Governor in federal court. As a result, Plaintiffs cannot demonstrate any likelihood of success as to those claims and those claims cannot form the basis for the requested preliminary injunctive relief.

## IV. Balance of Harms

As Plaintiffs have not shown a greater than negligible likelihood of success on the merits, the Court's analysis could end here. *See GEFT Outdoors*, 922 F.3d at 368; *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 966 (7th Cir. 2018). But going on to balance the harms to the parties and the public interest only further demonstrates that a preliminary injunction would be inappropriate. Under the "sliding scale approach," the less likely a plaintiff is to prevail, the more the balance of harms must weigh in his or her favor for preliminary injunctive relief to be warranted. *Valencia*, 883 F.3d at 966. Even if Plaintiffs had made some showing of a likelihood of success on the merits, the balance of harms weighs so heavily in favor of the Governor and, by extension, the public interest that Plaintiffs still would not be entitled to a preliminary injunction.

Plaintiffs themselves describe the COVID-19 pandemic as an "unprecedented emergency public health crisis that has left no one untouched and unaffected." (Compl. ¶ 2.) They do not dispute that the Governor's intent in issuing the Executive Orders has been to protect Illinois residents from the dangers presented by the unchecked spread of the disease. At stake are the

health and well-being of the more than 12 million residents of Illinois, *see* https://www.census.gov/quickfacts/IL (last visited July 28, 2020), thousands of whom have already died from the disease. The protective measures put in place through the Executive Orders follow guidance from leading public-health authorities and have no apparent nefarious ulterior motive to restrain individual rights. Granting a preliminary injunction to Plaintiffs would do extraordinary damage to the state's interest (and the public interest) in preventing the spread of COVID-19 right when many states are experiencing a surge in COVID-19 infections that poses a threat to public health nationwide. On the other side of the balance, Plaintiffs have made no showing that they are experiencing substantial harm as a result of the Executive Orders at this time or that they are likely to experience substantial harm in the near future. In sum, the potential harm to the public and the Governor's interest in preventing that harm overwhelm any the potential harm to Plaintiffs. Therefore, even if Plaintiffs had shown some greater than negligible likelihood of prevailing on the merits, the balance of harms weighs so heavily against them as to preclude the requested preliminary injunctive relief.

## CONCLUSION

For the reasons given above, Plaintiffs' motion for a temporary restraining order and preliminary injunction (Dkt. No. 11) is denied. Pursuant to 28 U.S.C. § 1292(a)(1) and Federal Rule of Appellate Procedure 4(a)(1), Plaintiffs must file any notice of appeal of the Court's interlocutory order denying preliminary injunctive relief by August 28, 2020.

ENTERED:

Dated:  August 1, 2020

Andrea R. Wood
United States District Judge